No. 89-292

IN THE SUPREME COURT OF THE STATE OF MONTANA

1990

THOMAS J. WINCHELL and DAVID WINCHELL,

        Plaintiffs and Appellants,

   -vs-

STATE OF MONTANA, DEPARTMENT OF STATE
LANDS,

        Defendants and Respondents.

'90 JAN 16 AM 9 51 FILED

APPEAL FROM: District Court of the Seventeenth Judicial District,
In and for the County of Dawson,
The Honorable H. R. Obert, Judge presiding.

COUNSEL OF RECORD:

    For Appellant:

        Thomas E. Smith; Moulton, Bellingham, Longo & Mather,
        Billings, Montana

    For Respondent:

        Lyle Manley; Dept. of State Lands, Helena, Montana

Submitted: Sept. 15, 1989

Decided: January 16, 1990

Filed:

Clerk

Justice William E. Hunt, Sr., delivered the Opinion of the Court.

Appellants, Thomas J. (Tom) and David Winchell, leased land from the Department of State Lands (Department). Following the Department's cancellation of their lease and the Board of Land Commissioners' adoption of that decision, the Winchells petitioned for judicial review in the Seventh Judicial District Court, Dawson County. The District Court affirmed the decision. The Winchells appeal to this Court. We affirm.

The sole issue raised on appeal is whether sufficient grounds existed to justify the cancellation of State Lease No. 0343 for mismanagement pursuant to § 77-6-113, MCA.

In 1981, the Department of State Lands issued State Lease No. 0343 to appellants, Tom and David Winchell. The 477.9 acres of land covered by the lease formed a portion of the common school lands, which are held in trust by the state of Montana and administered by the Department. Income from the lease of school trust lands is dedicated to the support of the common schools of Montana.

The Winchell family has leased the property in question for over 50 years. The lease that forms the basis of this action was scheduled to run for a 10-year period, from February 28, 1981 through February 28, 1991. Originally, the acreage covered by the lease was to be used for grazing purposes only. However, shortly after the parties executed the agreement, they agreed to reclassify 32 acres as agricultural land. The Winchells intended to develop a water-spreading project for the purpose of cultivating an alfalfa crop on the 32 acres. To this end, and with the financial backing of the Department and the United States

Soil Conservation Service (SCS), the Winchells constructed a concrete diversion structure on a stream flowing through the land.

In 1983, the Winchells concluded that the water source for the project was inadequate for producing a profitable alfalfa crop. In 1984, they negotiated a lump-sum settlement to repay the Department for the loan given them to develop the water-spreading system. Apparently, the parties were confused as to whether the settlement payment reclassified the 32 acres to grazing land. This question was resolved in Winchell v. Department of State Lands (Mont. 1988), 764 P.2d 1267, 45 St.Rep. 2121 (Winchell I), where we affirmed the District Court's issuance of a writ of prohibition against the Department. In Winchell I, we held that, upon payment of the lump-sum settlement, the 32 acres reverted to grazing land.

In May, 1984, Sharon Moore, land use specialist for the Department's Eastern Land Office, visited the lease site. Upon inspecting the land, she discovered a severe overgrazing problem. She observed that the cows on the property were quite thin and, as she completed her inspection, they followed her around bellowing as if they were starving. Moore also noticed that gravel had been removed from a creek bed and a prairie dog town had been established and was thriving and growing.

Moore called the Winchells several days after her visit and sent a follow-up letter dated May 14, 1984. In the letter, she advised that, to prevent further overgrazing problems, the cattle must be removed from the land as soon as possible. She instructed the Winchells to notify her when they removed the cattle, which the Winchells failed to do, although they testified that the cattle were taken off of the lease site immediately after they received Moore's letter.

Moore visited the site again in August, 1984. Once again, she observed severe overgrazing on the leased area. Some of the land looked like little more than bare dirt. Piles of manure were scattered about, indicating that the fields had been grazed heavily during the summer. Moore also sighted five to ten head of cattle on the property during this inspection.

Following the August inspection, Moore met with Tom Winchell and learned that he had filed for bankruptcy. Moore then performed a reappraisal of the lease site, in which she recommended that the Department cancel the lease for poor management, primarily due to the severity of the overgrazing problem. In October, 1984, she sent a memo to Mark Ahner, area manager of the Eastern Land Office, outlining the problems and recommending cancellation of the lease.

Because of the pending bankruptcy proceedings, the Department believed that it could not cancel the lease as Moore recommended. However, on April 25, 1985, Ahner sent a letter to the Winchells in which he placed several restrictions on the lease. These restrictions included 1) grazing would be prohibited until after seed set in the fall (approximately September 1st); 2) no more than 82 animal unit months would be allowed on the native range land; and 3) no grazing at all would be allowed on the 32-acre alfalfa field. In addition, Ahner instructed the Winchells to notify the Department prior to turning any livestock onto state land and to notify it within three days of removing animals from the property. Ahner also advised the Winchells to repair the concrete diversion structure, which had been damaged.

Moore next visited the property on May 9, 1985. During this inspection, she observed cattle on the land and noted that there remained a serious overgrazing problem. The

prairie dog population was not under control and the concrete diversion structure had not been repaired.

Moore again visited the property on July 15, 1985, at which time she observed three horses on the lease site. On September 29, 1985, she observed three horses as well as 16 cow/calf pairs on the land.

By motion dated January 22, 1986, the Department sought an order from the Bankruptcy Court requiring the Winchells to advise in writing whether they assumed or rejected the lease. Pursuant to a stipulation and order dated March 6, 1986, the Winchells agreed to assume the lease, subject to the following terms and conditions:

1. No grazing will be allowed on the leased premises until after September 15th of each year. The condition will remain a portion of the lease until the state tract has been properly reclaimed as verified by a written re-evaluation from the Department of State Lands.

2. No more than 82 animal unit months may be utilized from native range land.

3. Lessee will pay a one-quarter crop share for alfalfa hay cut from the water spreading system (32 acres). There will be no grazing on the alfalfa. In addition, debtor will be required to reseed the areas of the alfalfa fields which were destroyed by overgrazing. Such alfalfa reseeding must be done to SCS specifications. The reseeding must be completed during 1986 unless other plans are approved by the Department of State Lands in writing.

4. Prior to the turning out of any animal units on to the state land, the Lessee must notify the Eastern Land Office in Miles City in writing as to the number of livestock to be turned onto the state land and the date. The Lessee must notify the Eastern Land Office in writing as to the date when such cattle are removed. Such notice must be given in writing within three days of taking the animal units off state land.

5. The concrete diversion structure on the water spreading system must be repaired during 1986.

6. The Lessee is required to adequately control the prairie dog population which exists on state land as required by the lease agreement.

7. Any variations from this stipulation must receive prior written approval from the Department.

The stipulation was signed by Lyle Manley, attorney for the Department, and Gerald B. Murphy, attorney for the Winchells.

During 1986, Moore inspected the lease site six times. During one visit in May, 1986, and two visits in July, 1986, she sighted four horses in the alfalfa field. During her second July visit, she also noted that the concrete diversion structure had not been repaired and, as a result, gravel had washed out onto the alfalfa field and the opening where the structure had been had widened considerably.

On September 4, 1986, Moore observed four cow/calf pairs in the alfalfa field. She also encountered evidence indicating that livestock had grazed on other portions of the leased tract.

On October 30, 1986, Moore observed 110 cows and calves in the alfalfa field. The alfalfa field had not been reseeded. The diversion structure had not been repaired. Gravel had been removed from the creek bed.

On November 25, 1986, the alfalfa field had not been reseeded, no hay had been cut and the field was covered with weeds. The prairie dog population was still out of control.

Moore's final visit to the lease site occurred on May 29, 1987, after the Department had sent notice of cancellation to the Winchells. At that time, she noted an improvement in parts of the alfalfa field, although weeds remained in the center of the field. The prairie dog

population appeared to be fairly well under control. However, several head of cattle were on the property.

At no time did the Winchells inform the Department in writing of the dates when livestock were turned onto or taken off of the leased property. At no time did the Winchells repair the concrete diversion structure. At no time did the Winchells ask for or receive permission to remove gravel from the leased land, nor did they pay for the gravel that they removed. At no time did the Winchells receive prior written approval from the Department to allow a variation from the provisions of the stipulation.

In April, 1987, the Bankruptcy Court lifted the automatic stay provided by the Bankruptcy Act. On April 3, 1987, the Department sent notice of cancellation of the lease to the Winchells. Pursuant to the Winchells' request, a hearing on the matter was held on June 11, 1987. On October 16, 1987, the hearing examiner proposed an order cancelling the lease, finding that the Winchells had mismanaged the lease by overgrazing the land, failing to adequately control the prairie dog population and weeds on the land, taking gravel from the creek bed, failing to repair the concrete diversion structure, failing to harvest the alfalfa crop and failing to pay crop-share payments for the alfalfa crop. The Board of Land Commissioners (Board) adopted the hearing examiner's order on February 25, 1988. The Winchells appealed to the District Court, which affirmed the cancellation order. The Winchells now appeal to this Court.

Prior to the Board's adoption of the hearing examiner's order, the Department attempted, in December, 1987, to cancel automatically the lease for nonpayment of agricultural rentals pursuant to § 77-6-506, MCA. This attempt led to the Winchells' application for a writ of prohibition, which the

District Court granted and we affirmed in <u>Winchell</u> <u>I</u> (see discussion above).

The standard of judicial review of a contested administrative case is set out at § 2-4-704, MCA, which provides in pertinent part as follows:

> (2) The court may not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact. The court may affirm the decision of the agency or remand the case for further proceedings. The court may reverse or modify the decision if substantial rights of the appellant have been prejudiced because:
>
> (a) the administrative findings, inferences, conclusions, or decisions are:
>
> (i) in violation of constitutional or statutory provisions;
>
> (ii) in excess of the statutory authority of the agency;
>
> (iii) made upon unlawful procedure;
>
> (iv) affected by other error of law;
>
> (v) clearly erroneous in view of the reliable, probative and substantial evidence on the whole record;
>
> (vi) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

The Winchells argue that the decision of the hearing examiner, which was subsequently adopted by the Board and affirmed by the District Court, was clearly affected by an error of law, thereby prejudicing their substantial rights. The error of law relied upon by the Winchells is the hearing examiner's conclusion that 32 acres of the leased land were set aside for agricultural purposes.

We agree with the Winchells that this conclusion was in error for, as we held in Winchell I, the acreage reverted to grazing land in 1984. We do not agree, however, that this erroneous conclusion prejudiced the Winchells' substantial rights.

The findings of fact and conclusions of law set forth by the hearing examiner demonstrate that the lease was cancelled for a number of reasons other than the Winchells' failure to harvest the alfalfa crop or remit a crop-share payment. Primary among the reasons for cancellation was the Winchells' mismanagement by overgrazing and by failing to abide by the restrictions placed upon the land by the Department in 1985 and the bankruptcy stipulation and order in 1986.

The hearing examiner specifically determined that the Winchells were in gross violation of § 77-6-113(1)(b), MCA, which provides:

> (1) It shall be a condition of all leases of agricultural or grazing state lands that:
>
> . . .
>
> (b) in the case of grazing lands, the lessee shall observe the ordinary rules for good range management and shall manipulate the numbers, class, distribution, and season of the range use and the handling, feeding, breeding, and marketing of grazing livestock with a view of securing the production of the maximum of livestock and livestock products, consistent with the conservation of the land resources and the perpetuation of its productivity, and to these ends the state land lease may not be abused by overgrazing.

The facts leading to this conclusion were not clearly erroneous but were supported by substantial credible evidence. The testimony and demonstrative evidence of Sharon Moore graphically illustrated the deplorable condition of the land. Photographic evidence demonstrated that in many places

the land had been stripped of vegetation, leaving little more than bare dirt. Photos taken of the fence line between the lease site and a neighbor's property revealed that the damage extended only as far as the fence line, lending little credence to the Winchells' contention that the damage was due to hailstorms, drought and grasshoppers, not to overgrazing.

Although the Department directed the Winchells to keep livestock off of the land until the fall of each year, a restriction the Winchells agreed to in the bankruptcy stipulation, the evidence demonstrated that they consistently ignored this restriction. During three visits to the site in 1985, and during five out of six visits to the site in 1986, Moore observed livestock on the land. The Winchells claimed that the livestock was not theirs, that fences periodically washed out, allowing neighbors' cattle to stray on the land. Even assuming the contention is true, it is not relevant. The Winchells agreed that no grazing would be allowed on the land before September 15th of each year. If neighbors' cattle strayed onto the land, it was the Winchells' responsibility to make sure that they were removed.

The gross violation of a state lease by overgrazing mandates cancellation of the agreement. Section 77-6-113(2), MCA. In addition, the Department may cancel a lease in order to do justice to all parties concerned and to protect the interests of the state. Section 77-6-210(e), MCA. The evidence in this case amply demonstrated an abuse of state land. The Winchells violated the ordinary rules of good range management by allowing overgrazing of the land and by repeatedly refusing to comply with the restrictions placed upon the lease to alleviate the effects of the overgrazing. The Winchells' disregard for their responsibility for state land justified the cancellation of the lease in order to protect the interests of the state of Montana.

Affirmed.

_(signature)_
Justice

We Concur:

_(signature)_
Chief Justice

_(signature)_

_(signature)_

_(signature)_
Justices

- 11 -